and move to States v. Chanel Powell, 20-334-CR. Good afternoon, your honors. This is Michael Houston for the defendant appellate, Chanel Powell. Appreciate the opportunity to speak with you today on her behalf. In my opening statement, I want to focus on what we see as the heart of the argument. And it really follows and tracks the requirements of United States v. Studley. Whether or not Judge Kogan was correct in his finding in terms of the loss amount. Following the Studley holding, there had to be particular findings that the actual in the scope of Ms. Powell's agreement with the architects of the scheme, and that they had to be foreseeable to her. Now, we pointed out at sentencing that the government made several concessions that we think show that a finding that she was responsible for a loss amount of $40,000 was not based on sound footing. And it's clearly erroneous in terms of what Judge Kogan decided. One was that the government conceded that the money that went directly to Ms. Powell's account was far less than $40,000. The other concession was that Ms. Powell did not have specific evidence of the amount of money that was on the cards, the net spend cards, if you recall from the record that we provided. Also, the government really relied on several areas of speculation, one that she could access information, quote, if she wishes, and did so, quote, for a couple of accounts, meaning her number accessed the account through her telephone system, and it was logged. But there, there's no showing that she saw any specific amounts or knew any amounts. It's just she had access. Also, there was speculation that somehow she is aware, that's a quote, somehow she is aware of how much money is on the card and how much money to withdraw, because by the end of the day, those accounts are largely empty. And lastly, there's another surmise that there were cards that were sent to her address that were never activated, but they were stopped by the VA, the Veteran Administration security measures. But again, that was just a conclusion, but there's no specific evidence of it. And so our position is that these array of concessions and guesses show that the government's argument about her involvement was based on something that this court, something that Judge Kogan could not rely on, that this was not the type of particularized finding that is required. We feel that the government failed to appreciate that there's a difference between conspiracy, improving the conspiracy, and then also a loss amount. And we pointed to a ghetto, United States versus ghetto in that argument in our brief. And really the issue is not knowledge of conspiracy or upstate that other people are doing, but what is the defendant's specific agreement? And we pointed to the application note 3B regarding the scope of jointly undertaken criminal activity. And just moving on, there are a couple of points we really wanted to point out that showed her lack of involvement and also the loss amount was not sufficiently shown. One is that we gave an example about 32 cards out of 2,400, and that's less than 1.5% were sent to her. And as the court, Judge Kogan stated, that kind of gets us closer to the suddenly kind of, I got my little piece of this, but it's a relatively small piece. And granted, he said that in the context of the minor role argument, but the two are intertwined, frankly speaking. And then also the small fee she earned in terms of her involvement. The withdrawals in this case, the indictment was 4,911. Our review of the pre-sentence report was 3,114. So these are the numbers she's actually seen that are verified, not this $40,000, $48,000 number. And also we gave an example of how with respect to victim A, there was $3,496 that was put into her account. And from the pre-sentence report, $4,000 to $3,400 was sent along, and she kept $96.65. So that gives, I think, a proper example of really what her scope of her agreement was and showed how fungible and how minor it was. And just in closing, before I take any questions, I will also say that we believe the restitution order is wrong because it actually mirrors the loss amount. It's again about foreseeability, her particularized agreement, and knowledge. And then I'll just say this about the minor role. Again, these do really intertwine, that this record shows that her relationship was one where she was taking direction of subservient. She was fungible, and she had limited awareness of what was going on, and really was her own conduct that she was dealing with. So with that, I'll take any questions from the panel, and I appreciate this opportunity to speak and argue on behalf of Ms. Powell. Thank you very much. Judge Park. Yes, thank you. So I understand that Judge Kogan's basis for the particularized finding was that the bank accounts were controlled by Ms. Powell. And I guess I understand why you would like the finding to be based on what she pocketed, but why is that not sufficiently foreseeable, and within the scope of her involvement in the conspiracy? Well, Ron, I appreciate the question. From the review of the records here, there were two accounts, and there's one specifically that I recall, there was a Wells Fargo account. So I do wanna make sure that the court's not under the impression that there were multiple accounts that she's involved with. There were instances where she had two of her accounts at play, and that money went through that account. And as the government says though, it was far less than the $40,000. So that's really what I'm hanging my hat on in terms of that argument. So we have the government's concession saying far less than 40,000 went through the bank account, her bank account, which was involved in the VA scheme. So, but I do wanna make sure that the court doesn't have the impression that somehow all the money that was involved in this scheme went to her account. Okay, but I thought she controlled or had access to accounts that the money went through. Is that not right? Well, and maybe I didn't understand the question. There are the net spend cards themselves. So, and I think that goes to the access of the checking in on the cards or logging into the cards. The record that we have in this case is that Ms. Powell didn't, she didn't transfer or control the money that was put onto those cards. What we have is that the cards are being sent to her house, different locations, that's part of it. And then there's a few instances of money being put through her account from the VA. And for instance, that's victim A, where money went from the VA into her account and then was wired. The other instances is that you have the leader of the scheme who is sending her cards and then the cards are being loaded up with money. She's not doing the loading up with money and she's not, you know, she's not doing it or she's not selecting them. She's not getting the identifying information. She's not doing any of that technical work in terms of, you know, filling up the cards. What she's really doing is that at the end of it, she takes the cards and it goes to the ATM and withdraws the money. So she's, you know, what we stated is that she receives cards at her house. They're filled up by, you know, other folks. And then she then goes to ATM and withdraws money. That amount, in this case, was something about either $4,900 or 3,000, you know, semi-dollars that happened with respect to her. Yeah, I'm sorry. I was not being clear. I was referring to the, I guess, two separate things that I could play to them. But the NetSpend cards that were sent to her, they were all her addresses in one form or another. So she controlled those cards. I guess they're physical cards that are supposed to count. And the amount on those is some $40,000. Is that right? Yes. It's between that, Your Honor. And I really want to be careful. It's the cards themselves, the accounts. There's 34 accounts in the cards, but also money did go through her checking account, her savings account. And the total was the $48,000-some-odd dollars in total. Okay, so I guess stepping back from those details, what about the reliance on her controlling either the physical cards or the accounts through which the money flowed was not sufficiently particularized under Studley? Well, I think in the first instance that, there's no showing that she knows the amounts that were actually taken from, the amounts on the cards are actually in the account. I think it's one thing to have a card. The evidence we have here is that she withdrew the amount that I've mentioned already, the $3,900 or the $4,900 to the $3,500 or $4,900. There's nothing showing that she's seen what's on these cards in terms of what's actual, what are the actual specific amounts? Okay, so you would add a knowledge of amount requirement to the level of particularity required. Is that fair? Well, I think in this case, I think that's fair, but I think that's what is required. Well, I think other than that, you're just looking at sort of an empty page. And then obviously she knows her agreement, but, excuse me, another call was trying to come through. I apologize about that. But as I was saying, without that extra step, all you have is just sort of a blank slate right there. Okay, thank you. Judge Nardini? I have no questions, thank you. And I have no questions. Let's hear from the other side. Good afternoon. This is Virginia Wynn. I'm Special Assistant United States Attorney, and I represent the government in this matter. May it please the court. Essentially what we're looking here is an allegation of procedural error by the lower court in determining the loss calculation, as well as the role adjustment. And I will briefly discuss that, but it seems that that's less of what is being put forth at this time. I think what's important here is to look at how the loss amount was calculated, because the facts are a little convoluted. The district court determined the loss amount essentially from two buckets of money. Money that went into net spend accounts that were open in veterans' names, and then money that was deposited into the defendant's own bank accounts. About more than $38,000 of the loss came from the net spend accounts. And when we talk about the net spend accounts, they're net spend accounts where those cards were personally used by the defendant to make ATM withdrawals. And then there's also net spend cards where the defendant, using her phone, called net spend and checked the account balance for those accounts. So that's where more than $38,000 of the loss comes from. With regard to money into the defendant's bank account, there's a few examples of that. But again, to simplify the facts, and to get us over that $40,000 threshold, I think the easiest number to look at is there was a $3,500 direct deposit of a veteran's monthly benefit into Chanel Powell's bank account. So it appeared on her bank statement as a deposit from the Department of Treasury to the defendant. So those two numbers alone, 38,000 plus, and then the $3,500 of that veteran's benefit into Ms. Powell's own account puts the court over the $40,000 threshold. Now there's some other more complicated facts involving non-veteran victims, but I think at this stage, it doesn't make sense to go into that. However, I'm happy to answer any questions from the court. But the key question here is whether we're over the $40,000 threshold and whether that was conduct in which the defendant engaged as part of the scope of her conspiracy. And what the court saw and what the government sees here is this is directly from activity that the defendant engaged in and facilitated. She used these particular cards. She called to check the account balance of these particular accounts, and she received a deposit of money into her bank account. So this is not studly or ghetto as cited by the defendant where there's other individuals acting and making ATM withdrawals with other net spend cards that the defendant doesn't touch. These are only transactions to which the defendant is directly related or facilitating. And that's why it is jointly undertaken conduct of the defendant as part of the scope of the conspiracy. Next, turning to the foreseeability prong, the information provided so far and argued by the defendant is that it was somewhat speculative. We do know that she checked the balances, but we don't know that she knew the specific balance of every card she possessed that was mailed to her address. So what I'd like to do, and I think this will assist the court in looking at the foreseeability component of the loss amount, is to look at the numbers that are in the record. We know that she herself possessed or accessed 32 different net spend cards. So to get a loss of over $40,000, which is the threshold we're looking at here, across 32 different prepaid cards, that turns out to be anything  gets us over $40,000. And looking at that number and comparing what we know from the record, how she used specific net spend cards, we can see it was well over $1,250 that were withdrawn from each of those cards. So looking at the pre-sentence report, for example, we know that the prepaid card in John Doe number one's name, the defendant drew more than $4,200 in six consecutive days using John Doe number one's card. Using John Doe number two's card, she withdrew $2,700 in three days. Using John Doe number three's card, she withdrew over $6,500 in eight days. Clearly, it's reasonable to see that it's more than $1,250 per prepaid card that she receives, because she's withdrawing more than that from each card. And we can also look to the specific monthly veterans benefits that we know are being received from the record. We know different veterans get different monthly amounts. And we have, at least from the record, the specific data points, the monthly benefit for six different veterans. And those six different veterans range on the low end from $650 all the way up to $4,200. If you average out those six data points, you have an average benefit of $2,300 a month. Again, well over our average threshold here of $1,250. Because each of those cards, each of those 32 cards has a different veteran's name on it. And that's how you foreseeable. The defendant points out the 4,900 number as just the amount that she withdrew. But that's not a real fair statement of the facts. Those are the withdrawals where the defendant is depicted at the ATM machine, that is with ATM surveillance footage. But we know she made all of the withdrawals for the cards that were sent to her addresses because she was using them at the same ATM locations and dates and times as the locations where we actually have the ATM footage. So the evidence is clear that for all the cards sent to her home addresses, she was the one using them. All of that conduct shows that her role was significant. 32 cards across a three-year period where she lived in three different homes and even moved across state lines in that timeframe. She checked the balance for accounts where the cards were not mailed to her, but sent to someone else. In one of those cases, it was someone in Florida. She used her own bank accounts to facilitate the scheme. A veteran's monthly payment was direct deposited into her account. She gave one of her co-conspirators in Jamaica access to her bank account so that they could make withdrawals from the account without having to send it by wire and incurring transaction costs. Her role here was significant, at least more than the person who just goes and makes ATM withdrawals. She was sending the money directly to Jamaica at other points via wire. And she had to communicate with the others about the balance on the cards that she had checked and about her change of address to continue receiving these prepaid cards. In sum, the district court considered the facts and thoughtfully applied them to the Studley standard, that two-prong test. And there's no clear error in the court's factual determination, so we ask that the sentence be affirmed. And I'm happy to answer any questions from the court. Thanks very much. Judge Park, any questions? Yes, just one. So did the district court make the particular finding as to the foreseeability that you kind of just took us through with the numbers and the cards to get to the number that, the $40,000 number? Well, we did not go through the specific numbers, Your Honor. That is not referenced in the hearing, but it's referenced in the record that is the pre-sentence investigation report. What the court did state, which the government believes is sufficient findings supported by the record is in the appendix, the joint appendix at 141 to 42 in the transcript, where the court specifically said, you know, I agree that Powell had no actual knowledge that it was high, that it was this high of an amount of money, but the test is reasonable foreseeability. And with all the cards that she was handling, the court found that it would strain credulity to say it wasn't reasonably foreseeable that this amount could be involved in the entire scheme. And the court specifically compared the facts to Studley and differentiated them. Yeah, I guess I'm just a little bit, confused as to how to put together the requirement from Studley about a particular finding and the reasonable foreseeability, but the same, you know, one is particular and the other is sort of just a reasonable, more general test. Well, Your Honor, I believe the Studley facts relate more to the scope of conduct. And if Studley were to apply here, I think the defendant would have a very strong argument if we were trying to apply the veterans' money that got sent to some of those other 2,400 veterans' cards. But we're not looking to account that loss or attribute that loss to the defendant. It's just the cards over which she had control. So in Studley, it was other people engaging with other victims than the defendant, Studley himself. We're only holding the defendant accountable here for the accounts that she was directly touching. Okay, thank you. You're welcome. Judge Nardini. Can I ask a brief factual clarification? There's this dollar amount of $1,559 attributable to victim A. And in the red brief on page 16, you described it as non-veteran benefits. But then in the blue brief, it's described as that amount as having a VA source. And I have to say, I had a lot of trouble understanding through the briefs, what is this money we're talking about? Who got the money, what is it, and how is it attributable to this defendant? Sure, and those are the somewhat confusing facts. So victim A is a non-veteran. She received, unbeknownst to her, the source of veteran's direct deposit into her bank account. Then she was instructed to send some of that money to the defendant and others. So she herself, victim A, deposited $3,000 cash into Ms. Powell's account as part of that funneling of money. She also sent additional money to others. So she had a loss of greater than $3,000. But at the same time- So hang on, so just how much money of veteran's money came into her account? One deposit was $3,500, and there was also a second deposit, but that didn't go get funneled toward the defendant. Okay, so she got $3,500 in a veteran's benefit? Yes. And then she deposited 3,000 of that with the defendant's account? Correct. And then there's an additional 1,559? Right, because she sent $2,000 to a different person, not the defendant. Got it, so some of that was just her own money. Exactly. All right, I'm not sure the money is adding quite up to me, but I guess we're dealing in approximations  All right, that's my only question, thank you. You're welcome. Thank you, and has the Fenton's Counselor joined any time? Yes, Your Honor. So just in terms of the particularized finding, the recitation that the government just made, it's not the recitation that was made at Fenton's Sink. For instance, with respect to John Doe 1, there was a deposit made, but in the pre-sentence report, and I am just looking at it here, the ATM surveillance shows Bill and Miss Powell from May 4th, 2017 and June 2nd, 2017. And this is the point I'm trying to make, that we're not really contesting that there was these transfers. The issue is what was her involvement, because in this factual record, what's being put forward in terms of her coordination, it's really finite and controlled. Now the government's saying that she looked at balances, when before the record was she just logged in. And then we just have silence with respect to what she saw or what she did not see. And so I do think we have to keep the facts that are in play and not sort of aggravate them or inflate them. It was simply that she logged in. And the government made this statement that the far less than $400,000 went through, $40,000 went through her account. And the reason why we point to the $4,911, because that's what the government stated in her indictments, that's what Ms. Powell pled guilty to at her plea. Those are the specific amounts that she withdrew. Besides that, everything else is this sort of gray area and the issue of what is her foreseeability and what was her agreement. Only thing else I'd like to point out too, two of the cases that the government relies on, sort of make the point that we're trying to get at, there was United States v. Stevens, where you had people sort of in assembly line fashion, where everybody's opening the envelopes together, they're counting the money. That type of coordination is simply absent in this case. And then also, there was another case that they used, which is a live on wall where you had a doctor who was at a high level, really coordinated and controlling the fraud or conspiracy. Again, Ms. Powell did not have that position or that level of responsibility or creativity with respect to this case. So we ask that the court vacate the sentence and remand so we can have a proper factual finding with respect to the lost amount and also her role in the offense. Thank you so much. Okay, any other questions? Judge Nardin? No, thank you. Okay, we'll reserve decision in USA v. Powell.